## THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

| | |
|---|---|
| THE FISCAL COURT OF CALLOWAY COUNTY KENTUCKY; THE CITY OF CAMPBELLSVILLE; THE FISCAL COURT OF DAVIESS COUNTY KENTUCKY; THE FISCAL COURT OF FULTON COUNTY KENTUCKY; THE FISCAL COURT OF HANCOCK COUNTY KENTUCKY; THE FISCAL COURT OF HICKMAN COUNTY KENTUCKY; THE FISCAL COURT OF MCLEAN COUNTY KENTUCKY; THE FISCAL COURT OF MUHLENBERG COUNTY KENTUCKY; THE CITY OF MURRAY; THE CITY OF OWENSBORO; THE FISCAL COURT OF SPENCER COUNTY KENTUCKY; THE FISCAL COURT OF TAYLOR COUNTY KENTUCKY; and THE FISCAL COURT OF WEBSTER COUNTY KENTUCKY, | Civil Action No.:   3:21-cv-333-DJH<br><br>Judge:   David J. Hale<br><br><br>**COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiffs,

-against-

MCKINSEY & COMPANY, INC., UNITED STATES,

Defendants.

The Fiscal Court of Calloway County on behalf of Calloway County ("Calloway County"), the City of Campbellsville, the Fiscal Court of Daviess County on behalf of Daviess County ("Daviess County"), the Fiscal Court of Fulton County on behalf of Fulton County ("Fulton County"), the Fiscal Court of Hancock County on behalf of Hancock County ("Hancock County"), the Fiscal Court of Hickman County on behalf of Hickman County ("Hickman County"), the Fiscal Court of Mclean County on behalf of McLean County ("McLean County"), the Fiscal Court of Muhlenberg County on behalf of Muhlenberg County ("Muhlenberg County"), the City of Murray, the City of Owensboro, the Fiscal Court of Spencer County on behalf of Spencer County ("Spencer County"), the Fiscal Court of Taylor County on behalf of Taylor County ("Taylor County"), and the Fiscal Court of Webster County on behalf of Webster County ("Webster County") (collectively "Plaintiffs") bring this lawsuit against McKinsey & Company, Inc. ("McKinsey" or "Defendant") to recover taxpayer money and resources spent to combat the opioid epidemic wreaking havoc on Plaintiffs' communities. Plaintiffs spend significant amounts to protect its residents from the opioid epidemic that is taking a daily, deadly toll in their communities, and counties across the nation. Based upon personal knowledge, information, belief, and investigation of counsel, Plaintiffs specifically allege:

## INTRODUCTION AND FACTUAL ALLEGATIONS

1.      This case arises from the worst man-made crisis in American medical history: the over-prescription, misuse and abuse of opioids. This opioid epidemic was fueled by deceptive marketing strategies that expanded opioid prescription, creating overuse and addiction.

2.      County and city governments perform functions that are at the very heart of our democracy, local self-governance. Because of Defendant's egregious wrongdoing, for the last two decades, in addition to providing these essential and challenging services, county and city

governments have been facing new challenges resulting from the opioid epidemic.

3.      Opioids are estimated to kill upwards of 100 Americans per day, and cost health services providers billions of dollars per year both in payments for unnecessary and harmful prescriptions of the drugs themselves and the costs of treating the diseases and injuries they cause.

4.      Accidental drug overdose deaths, of which at least two-thirds are opioid-related overdoses, are the leading cause of death for Americans under the age of 50.

5.      Accidental drug overdose deaths, predominantly from opioids, exceed the number of deaths caused by car wrecks or guns.

6.      The economic burden caused by opioid abuse in the United States is approximately $78.5[1] billion, including lost productivity and increased social services, health insurance costs, increased criminal justice presence and strain on judicial resources, and substance abuse treatment and rehabilitation.

7.      One company that caused the opioid epidemic—and its widespread, tragic effects on children and the schools that serve them---is Purdue Pharma, L.P., ("Purdue") the makers of Oxycontin. The primary architect of Purdue's unlawful plan to sell more Oxycontin by addicting more people became consulting firm Defendant McKinsey & Company, Inc., United States, ("McKinsey").

8.      On May 10, 2007, John Brownlee, United States Attorney for the Western District of Virginia, announced the guilty plea of the Purdue Frederick Company, the parent of Purdue because of the misbranding of Purdue opioid brand, OxyContin. Brownlee stated,

   "Even in the face of warnings from health care professionals, the media, and members
   of its own sales force that OxyContin was being widely abused and causing harm to our
   citizens, Purdue, under the leadership of its top executives, continued to push a
   fraudulent marketing campaign that promoted OxyContin as less addictive, less subject

---

[1] *CDC Foundation's New Business Pulse Focuses on Opioid Overdose Epidemic*, Centers for Disease Control and Prevention (Mar. 15, 2017), https://www.cdc.gov/media/releases/2017/a0315-business-pulse-opioids.html.

to abuse, and less likely to cause withdrawal. In the process, scores died as a result of OxyContin abuse and an even greater number of people became addicted to OxyContin; a drug that Purdue led many to believe was safer, less subject to abuse, and less addictive than other pain medications on the market."

9.      Along with the guilty plea, Purdue agreed to a Corporate Integrity Agreement with the Office of Inspector General of the United States Department of Health and Human Services. For a period of five years, ending in 2012, Purdue was obligated to retain an Independent Monitor and submit annual compliance reports regarding its marketing and sales practices and training of sales representatives vis-à-vis their interactions with health care providers.

10.     The Corporate Integrity Agreement imposed constraints on Purdue's sales and marketing practices, yet, despite the agreement's constraints (i.e., do not lie about OxyContin), Purdue and its controlling owners, the Sackler family ("Sacklers"), still intended to continue maximizing OxyContin sales and the profits they brought.

11.     As a result of the 2007 guilty plea, the Sacklers made the strategic decision to find ways to distance themselves from Purdue, which by then they regarded as a dangerous concentration of ownership risk for themselves, and soon after the guilty plea was announced David Sackler wrote to his father, Richard Sackler, and uncle, Jonathan Sackler, describing precisely what that "risk" was: legal liability for selling OxyContin. In response to Jonathan Sackler's stating that "there is no basis to sue the family," David Sackler, denigrating the Americans addicted to Oxycontin, replied: "This is the land of the free and the home of the blameless. We will be sued."

12.     The two branches of the Sacklers considered their distancing options. One was to sell Purdue or merge it with another pharmaceutical manufacturer and put the proceeds into diversified assets. The second option was to take substantial distributions out of Purdue and secure a loan for Purdue to prevent the distributions from damaging the company's operations.

13.     For either option to work, the Sacklers, confronted with the Corporate Integrity

Agreement, needed to find a way to maximize addictive opioid sales in the short term to make Purdue attractive for merger or acquisition, or creditworthy to a lender.

14.    Without the means in-house to design and implement a sales strategy for OxyContin to satisfy the Sacklers' goals, Purdue and the Sacklers brought in the global management consulting firm, Defendant McKinsey & Company, Inc., United States, ("McKinsey"), to aid them by creating and implementing a plan for evading the strictures the Corporate Integrity Agreement placed on the marketing of OxyContin.

15.    As will be detailed in this Complaint, McKinsey's plan and its implementation succeeded for Purdue and the Sacklers, and, when the Corporate Integrity Agreement expired, the arrangement continued for years with "Project Turbocharge" producing ill-gotten profits from the marketing, promoting, distributing, and selling of excessive amounts of OxyContin by wrongful means.

16.    Eventually, McKinsey management personnel, in internal emails, reacted to the liability risk; to them, the question was not whether to destroy documents and emails, but what to do in addition to destroying that evidence:

---

Message

| | |
|---|---|
| From: | Martin Elling [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6B33C3264F744B04AF05FA59341271BE-MARTIN ELLI] |
| Sent: | 7/4/2018 12:10:13 PM |
| To: | A G [drarnabghatak@gmail.com] |
| Subject: | Re: [EXT]Re: Howdy |

Have a great fourth.  M

> On Jul 4, 2018, at 2:01 PM, A G <drarnabghatak@gmail.com> wrote:
>
> Thanks for the heads up.  Will do.
>
>> On Jul 4, 2018, at 7:57 AM, Martin Elling <martin_elling@mckinsey.com> wrote:
>>
>> Just saw in the FT that Judy Lewent is being sued by states attorneys general for her role on the
>> Purdue Board.  It probably makes sense to have a quick conversation with the risk committee to see if we
>> should be doing anything other that eliminating all our documents and emails.  Suspect not but as things
>> get tougher there someone might turn to us.  M
>>
>> +=========================================================+
>> This email is confidential and may be privileged. If you have received it
>> in error, please notify us immediately and then delete it.  Please do not
>> copy it, disclose its contents or use it for any purpose.
>> +=========================================================+

Things did get tougher there. On October 20, 2020, Purdue again pled guilty to federal crimes for its opioid marketing – this time for the years 2010 to 2018, when those marketing activities were developed and overseen by McKinsey. Purdue had already sought bankruptcy protection by then, a proceeding that presently prevents civil suits against the Sacklers as well as Purdue.

<u>**JURISDICTION AND VENUE**</u>

17.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because (i) Plaintiffs are citizens of a state different from Defendant McKinsey, (ii) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) none of the exceptions under the subsection apply to this action, and pursuant to 28 U.S.C. § 1331, based on Defendant's violations of federal law, specifically 18 U.S.C. § 1961, *et seq.* ("Racketeer Influenced and Corrupt Organizations Act" or "RICO"), 18 U.S.C. § 1965 pertaining to RICO jurisdiction, and supplemental jurisdiction over the state law claims set forth below pursuant to 28 § 1367, because those state law claims are so related to Plaintiffs' federal claims that they form part of the same case or controversy.

18.    This Court has personal jurisdiction over Defendant McKinsey because Plaintiffs' claims arise out of, or relate to, Defendant McKinsey's contacts with Kentucky.

19.    At all times relevant hereto, Defendant engaged in the business of researching, designing, and implementing marketing and promoting strategies for opioid manufacturer, Purdue, in the State of Kentucky and within Plaintiffs' Communities.

20.    This Court has jurisdiction over Defendant McKinsey due to its conduct in Calloway, Daviess, Fulton, Hancock, Hickman, McLean, Muhlenberg, Spencer, Taylor, and Webster Counties, the Cities of Campbellsville and Murray, and throughout Kentucky. McKinsey has deliberately engaged in significant acts and omissions within Calloway, Daviess, Fulton, Hancock, Hickman, McLean, Muhlenberg, Spencer, Taylor, and Webster Counties, and the Cities of Campbellsville,

Murray, and Owensboro that have injured their residents. McKinsey purposefully directed its activities

in Calloway, Daviess, Fulton, Hancock, Hickman, McLean, Muhlenberg, Spencer, Taylor, and

Webster Counties, the Cities of Campbellsville, Murray, and Owensboro, and the claims arise out of

those activities. Venue is proper in this District because a substantial part of the events giving rise to

Plaintiffs' claims occurred in, were directed to, and/or emanated from this District. 28 U.S.C. §

1391(b).

## PARTIES

21.     Plaintiff, the Fiscal Court of Calloway County Kentucky is located within the

Western District of Kentucky. Plaintiff is authorized to bring the causes of action brought in this

lawsuit. *See* KRS 67.080(1)(e) ("The fiscal court may … Exercise all the corporate powers of

the county unless otherwise provided by law…."); KRS 67.083 (County fiscal court charged

with "abatement of public nuisances."); *Upton v. Whitley County*, 220 S.W.2d 376, 376 (Ky.

1949) ("The fiscal court is … vested with the primary right to bring all suits on behalf of the

county."). Its offices are located in Murray, Calloway County, Kentucky.

22.     Plaintiff, the City of Campbellsville is located within the Western District of

Kentucky. Plaintiff is authorized to bring the causes of action brought in this lawsuit. *See* KRS

82.081 ("Each city shall constitute a corporation, with capacity to sue and be sued…"); KRS

83.420 ("In its corporate capacity the city may contract and be contracted with and may sue and

be sued.") Its offices are located in Campbellsville, Taylor County, Kentucky.

23.     Plaintiff, the Fiscal Court of Daviess County Kentucky is located within the

Western District of Kentucky. Plaintiff is authorized to bring the causes of action brought in this

lawsuit. *See* KRS 67.080(1)(e) ("The fiscal court may … Exercise all the corporate powers of

the county unless otherwise provided by law…."); KRS 67.083 (County fiscal court charged

with "abatement of public nuisances."); *Upton v. Whitley County*, 220 S.W.2d 376, 376 (Ky.

1949) ("The fiscal court is … vested with the primary right to bring all suits on behalf of the county."). Its offices are located in Owensboro, Daviess County, Kentucky.

24.    Plaintiff, the Fiscal Court of Fulton County Kentucky is located within the Western District of Kentucky. Plaintiff is authorized to bring the causes of action brought in this lawsuit. *See* KRS 67.080(1)(e) ("The fiscal court may … Exercise all the corporate powers of the county unless otherwise provided by law…."); KRS 67.083 (County fiscal court charged with "abatement of public nuisances."); *Upton v. Whitley County*, 220 S.W.2d 376, 376 (Ky. 1949) ("The fiscal court is … vested with the primary right to bring all suits on behalf of the county."). Its offices are located in Hickman, Fulton County, Kentucky.

25.    Plaintiff, the Fiscal Court of Hancock County Kentucky is located within the Western District of Kentucky. Plaintiff is authorized to bring the causes of action brought in this lawsuit. *See* KRS 67.080(1)(e) ("The fiscal court may … Exercise all the corporate powers of the county unless otherwise provided by law…."); KRS 67.083 (County fiscal court charged with "abatement of public nuisances."); *Upton v. Whitley County*, 220 S.W.2d 376, 376 (Ky. 1949) ("The fiscal court is … vested with the primary right to bring all suits on behalf of the county."). Its offices are located in Hawesville, Hancock County, Kentucky.

26.    Plaintiff, the Fiscal Court of Hickman County Kentucky is located within the Western District of Kentucky. Plaintiff is authorized to bring the causes of action brought in this lawsuit. *See* KRS 67.080(1)(e) ("The fiscal court may … Exercise all the corporate powers of the county unless otherwise provided by law…."); KRS 67.083 (County fiscal court charged with "abatement of public nuisances."); *Upton v. Whitley County*, 220 S.W.2d 376, 376 (Ky. 1949) ("The fiscal court is … vested with the primary right to bring all suits on behalf of the county."). Its offices are located in Clinton, Hickman County, Kentucky.

27.    Plaintiff, the Fiscal Court of McLean County Kentucky is located within the

Western District of Kentucky. Plaintiff is authorized to bring the causes of action brought in this lawsuit. *See* KRS 67.080(1)(e) ("The fiscal court may … Exercise all the corporate powers of the county unless otherwise provided by law…."); KRS 67.083 (County fiscal court charged with "abatement of public nuisances."); *Upton v. Whitley County*, 220 S.W.2d 376, 376 (Ky. 1949) ("The fiscal court is … vested with the primary right to bring all suits on behalf of the county."). Its offices are located in Calhoun, McLean County, Kentucky.

28.    Plaintiff, the Fiscal Court of Muhlenberg County Kentucky is located within the Western District of Kentucky. Plaintiff is authorized to bring the causes of action brought in this lawsuit. *See* KRS 67.080(1)(e) ("The fiscal court may … Exercise all the corporate powers of the county unless otherwise provided by law…."); KRS 67.083 (County fiscal court charged with "abatement of public nuisances."); *Upton v. Whitley County*, 220 S.W.2d 376, 376 (Ky. 1949) ("The fiscal court is … vested with the primary right to bring all suits on behalf of the county."). Its offices are located in Greenville, Muhlenberg County, Kentucky.

29.    Plaintiff, the City of Murray is located within the Western District of Kentucky. Plaintiff is authorized to bring the causes of action brought in this lawsuit. *See* KRS 82.081 ("Each city shall constitute a corporation, with capacity to sue and be sued…"); KRS 83.420 ("In its corporate capacity the city may contract and be contracted with and may sue and be sued.") Its offices are located in Murray, Calloway County, Kentucky.

30.    Plaintiff, the City of Owensboro is located within the Western District of Kentucky. Plaintiff is authorized to bring the causes of action brought in this lawsuit. *See* KRS 82.081 ("Each city shall constitute a corporation, with capacity to sue and be sued…"); KRS 83.420 ("In its corporate capacity the city may contract and be contracted with and may sue and be sued.") Its offices are located in Owensboro, Daviess County, Kentucky.

31.    Plaintiff, the Fiscal Court of Spencer County Kentucky is located within the

Western District of Kentucky. Plaintiff is authorized to bring the causes of action brought in this lawsuit. *See* KRS 67.080(1)(e) ("The fiscal court may … Exercise all the corporate powers of the county unless otherwise provided by law…."); KRS 67.083 (County fiscal court charged with "abatement of public nuisances."); *Upton v. Whitley County*, 220 S.W.2d 376, 376 (Ky. 1949) ("The fiscal court is … vested with the primary right to bring all suits on behalf of the county."). Its offices are located in Taylorsville, Spencer County, Kentucky.

32.    Plaintiff, the Fiscal Court of Taylor County Kentucky is located within the Western District of Kentucky. Plaintiff is authorized to bring the causes of action brought in this lawsuit. *See* KRS 67.080(1)(e) ("The fiscal court may … Exercise all the corporate powers of the county unless otherwise provided by law…."); KRS 67.083 (County fiscal court charged with "abatement of public nuisances."); *Upton v. Whitley County*, 220 S.W.2d 376, 376 (Ky. 1949) ("The fiscal court is … vested with the primary right to bring all suits on behalf of the county."). Its offices are located in Campbellsville, Taylor County, Kentucky.

33.    Plaintiff, the Fiscal Court of Webster County Kentucky is located within the Western District of Kentucky. Plaintiff is authorized to bring the causes of action brought in this lawsuit. *See* KRS 67.080(1)(e) ("The fiscal court may … Exercise all the corporate powers of the county unless otherwise provided by law…."); KRS 67.083 (County fiscal court charged with "abatement of public nuisances."); *Upton v. Whitley County*, 220 S.W.2d 376, 376 (Ky. 1949) ("The fiscal court is … vested with the primary right to bring all suits on behalf of the county."). Its offices are located in Dixon, Webster County, Kentucky.

33.    Defendant McKinsey & Company, Inc. United States is a foreign corporation with its principal office at 711 Third Ave., New York, NY 10017. It may be served with process through its registered agent, Corporation Service Co., 80 State Street, Albany, New York, NY 12207. Additionally, McKinsey, though its affiliate, McKinsey & Company, Inc. Washington DC, is

registered to do business in Kentucky and may be served with process through its registered agent, Corporation Service Co., 421 West Main Street; Frankfort, Kentucky 40601.

## CONTINUED FACTUAL ALLEGATIOSN

### A.    The Opioid Epidemic

64.    On October 26, 2017, the United States declared the opioid crisis a public health emergency. That year, opioid overdoses were responsible for more than 47,000 American deaths, and around 1.7 million people suffered from addiction related to prescription opioids.[2] According to recent estimates, as many as 130 people in the United States die every day from opioid overdoses, with as many as 35 percent of fatal overdoses involving prescription opioids.[3]

65.    The opioid crisis and related expenses continue to grow. According to a report issued on February 13, 2018, by Altarum, a nonprofit health systems research organization, the cost of the country's opioid crisis is estimated to have exceeded $1 trillion from 2001 to 2017, and was projected to have cost an additional $500 billion by 2020:[4]

---

[2] *Opioid Overdose Crisis*, NIH: National Institute on Drug Abuse (Jan. 2019), https://www.drugabuse.gov/drugs-abuse/opioids/opioid-overdose-crisis#one.

[3] *Id.* Overdose Deaths Involving Prescription Opioids, Centers for Disease Control and Prevention, https://www.cdc.gov/drugoverdose/data/prescribing/overdose-death-maps.html (last visited Sept. 19, 2019).

[4] *Economic Toll Of Opioid Crisis In U.S. Exceeded $1 Trillion Since 2001*, Altarum (Feb. 13, 2018), https://altarum.org/news/economic-toll-opioid-crisis-us-exceeded-1-trillion-2001.

66.    The nationwide deceptive marketing and sale of opioids to treat chronic pain is one of the main drivers of the opioid epidemic. Prescription opioids are powerful pain medications that historically have been used for short-term, post-surgical and trauma-related pain, and for palliative end-of-life care primarily in cancer patients. Because opioids are highly addictive and dangerous, the U.S. Food and Drug Administration regulates them as Schedule II Controlled Substances, a



classification reserved for drugs that have a high potential for abuse and that may lead to severe psychological or physical dependence.

67.    Kentucky has been hit hard by the opioid epidemic. In 2018, Kentucky providers wrote 79.5 opioid prescriptions for every 100 persons compared to the average U.S. rate of 51.4[5] prescriptions. McKinsey identified particular counties and towns, and even particular pharmacies, to flood with opioids.   In 2017, there were 1,160 drug overdose deaths involving opioids in Kentucky - a rate of 27.9 deaths per 100,000 persons. This is double the rate in 2009 and twice as

---

[5] Centers for Disease Control and Prevention. U.S. Opioid Prescribing Rate Maps. (2019, October 3). Retrieved from https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html.

high as the national rate of 14.6 deaths per 100,000 persons.[6] The total number of Kentucky overdose deaths from 2012 through 2016, at 5,821, outstripped the total number of highway fatalities in the state by more than 2,000.

68.     The opioid crisis has had a particularly profound impact on women, who are more likely than men to suffer from chronic pain, receive prescriptions for pain relievers and in higher doses, and use them for longer periods of time.[7] Women may become more dependent on prescription pain relievers more quickly than men.[8] Prescription pain reliever overdose deaths among women increased more than 400% from 1999 to 2010, compared to 237% among men.[9] The rates of Neonatal Abstinence Syndrome, which occurs when a baby is born addicted to opioids as a result of use by the mother during pregnancy, have also increased dramatically.[10] Nationally, the cost of treating Neonatal Abstinence Syndrome increased from $61 million in 2003 to nearly $316 million in 2012.[11]

**B.     Impact on America's Counties and Cities**

69.     For two decades, local governments have been addressing this major tragedy resulting from the nationwide opioid epidemic and the wrongdoing that caused it.

70.     Plaintiffs bring this action on behalf of themselves because they bear the steadily

---

[6] Debbie Cenziper, et al., The Opioid Files, Washington Post (Oct. 18, 2019), https://www.washingtonpost.com/graphics/2019/investigations/west-virginia-opioid-legal-battle-foster-care/
[7] *Opioid Addiction 2016 Facts & Figures,* American Society of Addiction Medicine, https://www.asam.org/docs/default-source/advocacy/opioid-addiction-disease-facts-figures.pdf.
[8] *Id.*
[9] *Id.*
[10] Hannah Rappleye et al., *Born Addicted: The Number of Opioid-Addicted Babies is Soaring*, NBC News, Oct. 9, 2017, https://www.nbcnews.com/storyline/americas-heroin-epidemic/born-addicted-number-opioid-addicted-babies-soaring-n806346. *Dramatic Increases in Maternal Opioid Use and Neonatal Abstinence Syndrome*, Nat'l Inst. on Drug Abuse, https://www.drugabuse.gov/related-topics/trends-statistics/infographics/dramatic-increases-in-maternal-opioid-use-neonatal-abstinence-syndrome (last updated Sept. 2015).
[11] T.E. Corr & C.S. Hollenbeak, *The economic burden of neonatal abstinence syndrome in the United States*, 112 Addiction 1590 (Sept. 2017), *available at* https://onlinelibrary.wiley.com/doi/abs/10.1111/add.13842.

rising costs of providing governmental and related supports and services to Kentucky residents relating to the opioid crisis.

71.     Plaintiffs help fund drug courts and drug court recovery programs that include addiction treatment. In recent years, Plaintiffs have been forced to increase their funding of these programs, many of which are opioid-related.

72.     Plaintiffs have invested in opioid overdose prevention training for their first responders and interested community members.

73.     Plaintiffs fund emergency and ambulance services for their residents and have seen a substantial increase in the amount of emergency services needed due to opioid-related events.

34.     Plaintiffs have been forced to fund an ever-increasing number of autopsies due to the epidemic. The autopsy expenditures on behalf of the Plaintiffs have significantly increased, year over year.

74.     Plaintiffs have been forced to spend substantial amounts of money on "Narcan" and other medication designed to treat opioid overdoses and abuse in their communities for their emergency services, prison services, and recovery programs.

75.     In an effort to prevent the spread of HIV, sexually transmitted diseases and hepatitis B and C as a result of the opioid crisis, several of the Plaintiffs have been forced to implement a needle exchange program.

76.     Many of the Plaintiffs have been forced to spend a substantial amount of money and resources on their detention centers because of the rising opioid epidemic. The increasing costs and resources to the taxpayer is substantial. Most of the inmates have substance abuse issues when they enter the detention center. Plaintiffs spend substantial funds annually to run their jails, including funds to provide medical services to prisoners. If an inmate is required to go to a local hospital due to overdose or a substance abuse issues, the jail must send a county-funded guard to be present with

the prisoner 24-hours-a day. Pregnant inmates suffering opioid addiction must be treated by the jail and babies born to prisoners become a costly expense to the county. The jail has had to increase personnel to address the crisis and needs more people and resources. The jail has also had to increase security measures to combat a growing issue of family and friends attempting to sneak opioids to addicted prisoners.

77.    Plaintiffs have increased expenditures on juvenile services and juvenile court matters due to the rising opioid epidemic.

78.    Plaintiffs have suffered by being required to spend increasing amounts of money and resources to combat the increasing opioid epidemic over the past decade.

79.    Plaintiffs also bear opioid-related costs associated with workers' compensation, and their workers' health and disability expenses and insurance, including increased use of prescription opioids, and the treatments required for opioid addictions, including treatment for overdoses and leaves of absence.

80.    As a further result, Plaintiffs also have provided, and will continue to provide, medical coverage, workers' compensation, and disability coverage to and through their employees or are self-insured and have paid, and will continue to pay, some or all of those benefits themselves and, when insured, have had to pay, and will continue to have to pay, increased insurance premiums

81.    Plaintiffs have expended their taxpayers' resources to deal with each of the aforementioned situations caused by the opioid epidemic, as well as many others.

### C.    McKinsey: The Schemes, The Implementation, The Impact

82.    The Sacklers have owned and controlled Purdue and its predecessors since 1952. At all times relevant to this Complaint, individual Sacklers occupied either six or seven of the seats on Purdue's board of directors, and at all times held a majority of board seats. To advise the board of directors of Purdue was to advise the Sacklers. The interests of the Sacklers and the Purdue board

of directors, and Purdue itself, as a privately held company, have been and remain all aligned, being practically indistinguishable.[12] McKinsey aligned itself with them for over a decade.

83. In Purdue's 2007 guilty plea to the misbranding of OxyContin in violation of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301, *et seq.,* Purdue admitted that "supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications."

84.    Pursuant to the Corporate Integrity Agreement that accompanied the guilty plea, Purdue was obligated to implement written policies regarding its compliance program including:

- "selling, marketing, promoting, advertising, and disseminating Materials or information about Purdue's products in compliance with all applicable FDA requirements, including requirements relating to the dissemination of information that is fair and accurate … including, but not limited to information concerning the withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products;

- compensation (including salaries and bonuses) for Relevant Covered Persons engaged in promoting and selling Purdue's products that are designed to ensure that financial incentives do not inappropriately motivate such individuals to engage in the improper promotion or sales of Purdue's products;

- the process by which and standards according to which Purdue sales representatives provide Materials or respond to requests from HCP's [health care providers] for information about Purdue's products, including information concerning withdrawal, drug tolerance, drug addiction, or drug abuse of Purdue's products," including "the form and content of Materials disseminated by sales representatives," and "the internal review process for the Materials and information disseminated by sales representatives."

85.    Purdue was obligated to engage an Independent Review Organization to ensure its compliance with the strictures of the Corporate Integrity Agreement, and to file compliance reports on an annual basis with the inspector general.

---

[12] Craig Landau, soon to become CEO of Purdue, acknowledged in May 2017 that Purdue operated with "the Board of Directors serving as the 'de facto' CEO." The future CEO understood he would have little practical power despite his new title. The owners ran the business.

86.    In the years after the 2007 guilty plea, Purdue would retain only the absolute minimum amount of money within Purdue: $300 million. Otherwise, all the money was distributed to the owners.[13]

87.    Concurrently, the Sacklers backed away from day-to-day jobs at Purdue. During the ongoing investigation that resulted in the 2007 guilty plea, "several family members who worked at Purdue stepped back from their operational roles."[14] In 2003, Richard Sackler resigned as the president to assume his role of co-chairman. Dr. Kathe Sackler and Jonathan Sackler exited their roles as senior vice presidents, as did vice president, Mortimer D.A. Sackler. But they remained on the board.

88.    The Sacklers faced a problem: the need to grow OxyContin sales as dramatically as possible to make Purdue an attractive acquisition target or borrower, while at the same time appearing[15] to comply with the Corporate Integrity Agreement.

89.    Purdue installed McKinsey to devise and implement an OxyContin strategy in line with the Sacklers' goals. This lawsuit addresses McKinsey's work in concert with Purdue and the Sacklers, beginning at least as early as 2004, and, in particular - for now[16] - in the years after the 2007 guilty plea relating to Purdue's marketing, promotion, distribution, and sales strategies for its opioids.

---

[13]  *See* Jared S. Hopkins, *At Purdue Pharma, Business Slumps as Opioid Lawsuits Mount*, Wall Street Journal, June 30, 2019, *available at:* https://www.wsj.com/articles/purdue-pharma-grapples-with-internal-challenges-as-opioid-lawsuits-mount-11561887120?mod=hp_lead_pos6

[14]  Barry Meier, *Pain Killer*, Pg. 167 (Random House 2018).

[15]  As one Purdue executive stated of Purdue's attitude toward the Corporate Integrity Agreement: "They did not listen to their critics and insisted they had just a few isolated problems. After the settlement, they didn't change – the way the sales force was managed and incentivized, everything stayed the same." *How Purdue's 'one-two' punch fuelled the market for* opioids, Financial Times, Sept. 10, 2018, *available at:* https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c

[16]  McKinsey internal documents are to be made public under recent consent judgments. https://oag.dc.gov/sites/default/files/2021-02/McKinsey%20Consent%20Judgment%20entered_0.pdf

90. Given the tension between compliance with the Corporate Integrity Agreement and the desire to sell more OxyContin, Purdue needed help, and Purdue agreed to pay money to McKinsey in exchange for McKinsey's telling the company how to sell as much OxyContin as conceivably possible so the Sacklers could obtain cash to diversify their investment holdings away from Purdue. Within weeks, McKinsey was inside Purdue working to devise and implement new marketing and promotion strategies for OxyContin.

91. By June 2009 McKinsey, Purdue and the Sacklers were working in concert to increase sales of Purdue's opioids. McKinsey promoted a specific marketing and sales strategy; Purdue adopted it, and, together, they implemented it. Despite the strictures imposed by the Corporate Integrity Agreement, OxyContin sales multiplied.

92. The Corporate Integrity Agreement's restrictions on Purdue's marketing and sales methods should have resulted in less OxyContin sales: the guilty plea identified illegitimate OxyContin sales that should cease. In fact, OxyContin sales did decrease in the immediate aftermath of the 2007 guilty plea. However, within five years, OxyContin sales had trebled, and all along it was McKinsey that devised, and aided and abetted Purdue in implementing, the joint strategy to accomplish the financial goals of Purdue and the Sacklers.

93. Purdue spent hundreds of millions of dollars implementing the strategy, with a final surge of OxyContin sales before the inevitable decline of the drug.[17]

94. In the end, despite the scheme to boost sales and profits so the Sacklers could avoid the risk of Purdue ownership, the Sacklers never sold Purdue, and no one loaned it money. But the scheme did turbocharge sales and swell profits. In time, the full scope of the opioid crisis and its causes began

---

[17] On February 10. 2018, Purdue announced withdrawal from marketing opioids, and disbanded its OxyContin sales force.

to become known. Along with the rest of the nation, Kentucky school districts are focused on its impact.

95. Throughout the relationship, McKinsey routinely got information from, advised, communicated with, and worked for the Purdue board of directors controlled by the Sacklers, and worked in league with, and managed, the Purdue marketing staff and sales force. This fits with what McKinsey touts as how to succeed at implementing a plan: "You can't even tell the difference between a McKinsey team member and one of our clients because we're working that cohesively together."

96.    McKinsey partner Maria Gordian, in her March 26, 2009 "EY 2009 Impact Summary" internal report had recounted serving the Sacklers, the CEO and others at Purdue:

> With client work extending through the 3rd quarter, and several additional proposals in progress, we continue to expand the depth and breadth of our relationships at Purdue. We look forward to deepening our relationships with the Sackler family and serving them on key business development issues, and to expanding our relationship with [John] Stewart and other members of the senior management team.

97. McKinsey staffed at least 36 known consultants to Purdue. As the growing national opioid crisis continued to worsen in the years after Purdue's 2007 guilty plea, McKinsey engineered a continuous integral role in the Sacklers' and Purdue's opioid marketing and sales practices; McKinsey formulated and oversaw them.

98. McKinsey's in-depth analysis of Purdue's OxyContin business led to implementing strategies to sell more and more opioids; as early as September 11, 2009, McKinsey informed Purdue that it could generate "$200,000,000 to $400,000,000" in additional annual sales of OxyContin by implementing McKinsey's strategies based on the opportunities its annual growth analysis had identified.

99. Having analyzed each Purdue opioid sales channel for opportunities and weaknesses and made presentations to the Sacklers and Purdue's board such as "Identifying Granular Growth Opportunities for OxyContin" in 2013, McKinsey knew that the dangerous qualities of opioids bore a

direct relationship to the volume of opioids being ordered, authorized, and prescribed and knew of widespread prescription opioid addiction and abuse, and diversion to illegal channels, including through financial incentives and information sharing arrangements it designed and implemented.

100. In 2012, the Corporate Integrity Agreement ended, and McKinsey continued its arrangement with Purdue and the Sacklers. In 2013, McKinsey proposed *Project Turbocharge*, a marketing strategy to increase opioid sales by hundreds of millions of dollars annually and urged Purdue and the Sacklers to "make a clear go-no go decision to 'Turbocharge the Sales Engine'" by devoting substantial capital toward McKinsey's plan. Together, they implemented it. And, since the potential ramifications of the name "Project Turbocharge" for selling addictive opioids were all too apparent, they euphemized it into "Evolve to Excellence, "E2E",[18] made it the sales theme for 2014, and trained the sales force on how to use it to sell OxyContin.

101. On August 23, 2013, McKinsey partners had initially met with the Sacklers – not the Purdue board – to pitch "*Project Turbocharge*." Dr. Arnab Ghatak, one of the McKinsey partners, recounted the meeting to Martin Elling fellow partner and a co-leader of the Purdue account, in an email exchange: "[T]he room was filled only with family, including the elder statesman Dr. Raymond [Sackler] … We went through exhibit by exhibit for about 2 hrs. … They were extremely supportive of the findings and our recommendations … and wanted to strongly endorse getting going on our recommendations." Martin Elling remarked in the same email correspondence that McKinsey's "findings were crystal clear to" the Sacklers, and that the Sacklers "gave a ringing endorsement of 'moving forward fast.'"

---

[18] Regarding the name change, CEO John Stewart wrote to McKinsey partners Rob Rosiello and Arnab Ghatak on August 15, 2013: "Paolo Costa was especially engaged in the discussion and he (among others) will be a champion for our moving forward with a comprehensive 'turbocharge' process – though we do need to find a better and more permanently appropriate name."

102. CEO John Stewart told the sales force that board member Paolo Costa was a "champion for our moving forward with a comprehensive 'turbocharge' process."

103.  McKinsey worked the marketing staff and sales force to implement *Project Turbocharge*, and the entire project was overseen by McKinsey and Purdue executives, who together comprised the Executive Oversight Team and Project Management Office.

104. The Sacklers stayed informed on implementation of McKinsey's *Turbocharge* OxyContin strategy; a September 13, 2013 board meeting agenda listed McKinsey's report on it to the Sacklers.

105.  *Project Turbocharge* called for doubling Purdue's opioid marketing and sales budget, even though, under McKinsey's guidance, Purdue's marketing and sales spending had already skyrocketed. As for McKinsey's influence after the 2007 guilty plea:



106. *Turbocharge* continued with the arrival of a new CEO. On January 17, 2014, new CEO Mark Timney received reports from McKinsey urging Purdue to further increase sales visits to "high-value" targets (i.e., the most prolific Oxycontin prescribers), to maximize profits.[19]

---

[19] In fact, recent deposition testimony raises the question of whether McKinsey had a hand in

107. McKinsey also urged that sales representatives devote two-thirds of their time to selling OxyContin and one-third of their time selling another Purdue product. Previously, the split had been fifty-fifty.

108. Long after McKinsey's creation and implementation of *Turbocharge*, McKinsey remained inside Purdue to maximize OxyContin sales by overseeing the continuing execution of its strategies and make modifications as needed, the antithesis of a one-off contract in which McKinsey might handle one discreet project for a client and finish its business. McKinsey stayed at it with Purdue through at least 2018.

109. From the outset of McKinsey's known opioid service to Purdue, the purpose was macabre: how best to "counter emotional messages from mothers with teenagers that overdosed in [sic] OxyContin." McKinsey advised marketing OxyContin based on the false notions of "freedom" and "peace of mind," misleading concepts cooked-up to avoid direct representations about "the withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products," as specified in Section III.B.2.c of the Corporate Integrity Agreement.

---

Timney's becoming CEO at Purdue. On October 30, 2020, Timney provided the following testimony (emphasis added):

 Q: Are you familiar with McKinsey & Company?
 A:  I decline to answer on the ground that I may not be compelled to be a witness against myself in any proceeding.
 Q:  Did individuals at McKinsey assist you in getting hired as the CEO of Purdue?
 A:  I decline to answer on the ground that I may not be compelled to be a witness against myself in any proceeding.

110.    Purdue marketing materials show the approach: [20]



111. McKinsey also promoted fomenting "patient pushback" - to get patients to directly lobby reluctant doctors for OxyContin.

112.  McKinsey analyzed the opioid prescribing patterns of individual physicians to identify the historically highest prescribers. McKinsey then worked with the sales force on "physician segmentation" to market-blitz that doctor segment. McKinsey identified, as optimal targets for a massive push to sell more OxyContin, physicians who had already been influenced by Purdue's pre-guilty plea misrepresentations and were thus primed to be high prescribers.

113. McKinsey continually refined this approach and sifted more data – down to the milligram. After physician segmentation began, McKinsey wanted and got Purdue's "prescriber-level milligram dosing data." In line with that, to address concerns about a decline in "higher strengths" prescribed and a decline in "tablets per Rx," McKinsey undertook "to actively monitor the number and size of opioid prescriptions written by individual doctors."

[20] *State of Tennessee v. Purdue Pharma L.P.*, Case No. 1-173-18 (Complaint May 15, 2018) ¶24.

114. McKinsey concluded that increased numbers of visits by sales representatives to prolific prescribers would increase the number of opioid prescriptions and urged strict management of the target lists of each member of the sales force so maximum sales time was focused on the most attractive targets.

115. When it had unveiled *Turbocharge* to Purdue and the Sacklers, McKinsey stated that the most prolific OxyContin prescribers wrote "25 times as many OxyContin scripts" than less prolific prescribers.

116. Even though higher dosages, particularly for longer periods, contributed to opioid dependency, addiction, and abuse, McKinsey knew that higher dosages of OxyContin prescription produced greater profitability, so McKinsey advised Purdue to focus on selling higher dosages.

117. The Sacklers were informed on July 23, 2013, that Purdue had identified weakness in prescribing rates among the higher doses of OxyContin and were reassured that "McKinsey would analyze the data down to the level of individual physicians" to study ways to maximize the sales of the highest-dose OxyContin pills. McKinsey's work on increasing individual prescription dose strength continued throughout McKinsey's time with Purdue.

118. McKinsey urged the use of quotas and bonus payments to motivate the sales force to push for as many OxyContin prescriptions as possible, notwithstanding that this had been addressed in the 2007 Corporate Integrity Agreement, which required Purdue to implement written policies regarding "compensation (including salaries and bonuses) for [sales representatives] engaged in promoting and selling Purdue's products that are designed to ensure that financial incentives do not inappropriately motivate such individuals to engage in the improper promotion or sales of Purdue's products."

119. During the post-guilty plea years, the importance of the Corporate Integrity Agreement was deliberately minimized. In 2008, Carol Panara joined the Purdue sales force from rival Novartis. She would stay with the company until 2013. Ms. Panara stated that the 2007 guilty plea was

deliberately downplayed by the company in presentations to its sales staff: "They said, 'we were sued, they accused us of mis-marketing, but that wasn't really the case. In order to settle it and get it behind us we paid a fine.' You had the impression they were portraying it as a bit of a witch hunt."[21] (Purdue and its executives had paid $634.5 million in fines.)

120. With the Corporate Integrity Agreement trivialized, McKinsey, at least as early as October 26, 2010, had advised the Sacklers and the Purdue board that Purdue should train its sales force to "emphasiz[e] the broad range of doses," with the intended effect of increasing the sales of the highest (and most profitable) doses. They implemented the marketing slogan "Individualize the Dose," and by 2013 encouraged sales representatives to "practice verbalizing the titration message" to prescribers.

121. By 2010, Purdue had implemented a 4-year McKinsey plan to dramatically increase the quota of required annual sales visits by Purdue's sales force to prescribers. The quota was 545,000 visits in 2010, 712,000 visits in 2011, 752,000 in 2012, and 744,000 visits in 2013.

122. In its "Identifying Granular Growth Opportunities for OxyContin" presentation to the Purdue board in July 2013, McKinsey urged Purdue, in addition to increasing the focus of the sales force on the top prescribers, to also increase the overall quotas for sales visits for individual sales representatives from 1,400 to 1,700 annually.

123. On August 8, 2013, as part of their "Identifying Granular Growth Opportunities for OxyContin" presentation, McKinsey urged the Sacklers to "establish a revenue growth goal (*e.g.,* $150M incremental stretch goal by July 2014) and set monthly progress reviews with CEO and Board."

124. Also, in 2013, McKinsey identified another way to get more sales calls out of its sales force: slash one-third of the training its expanding sales force got (from 17.5 days per year to

---

[21] *How Purdue's 'one-two' punch fuelled the market for opioids*, Financial Times, Sept. 10, 2018, *available at:* https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c

11.5 days):

**One possible way to attain benchmark ~1500 calls per year is to decrease training days by ~6 days and increase calls per day by 5%**    One possible route to benchmark

| Current call activity | | Potential new allocation | |
| Number of "on territory" days per year | | Number of "on territory" days per year | |
| Item | Days[1] | Item | Days[1] |
| Number of working days | 260 | Number of working days | 260 |
| Holidays | -11.3 | Holidays | -11.3 |
| Vacation and other time off | -27.2 | Vacation and other time off | -27.2 |
| Trainings and meetings | -17.5 | Trainings and meetings | -11.5 |
| Other company-related time off of field | -4.3 | Other company-related time off of field | -4.3 |
| Total days | 199.7 | Total days | 205.7 |
| Avg calls per day | × 7 | Avg calls per day | × 7.35 |
| Total calls per year | 1398 | Total calls per year | 1512 |

1 Purdue 2012 Actual data was used for this analysis

SOURCE: Purdue; team analysis

McKinsey & Company | 59

### D.    Generics: Turbocharging the Opioid Market

125. To further get around the Corporate Integrity Agreement restrictions on sales force incentive compensation, McKinsey got Purdue to incentivize selling generic versions of extended-release oxycodone in addition to selling OxyContin.

126. McKinsey's having the Purdue sales force also push generics, and get incentives for it, fit the fact that the Sacklers got into the generic opioid business soon after the 2007 guilty plea by setting up a generic opioid maker, Rhodes Pharmaceuticals, [22] According to a former senior manager at Purdue, "Rhodes was set up as a 'landing pad' for the Sacklers, to prepare for the possibility that they would need to start afresh following the crisis then engulfing OxyContin."[23]

---

[22] *Billionaire Sackler family owns second opioid maker*, Financial Times, Sept. 9, 2018, *available at:* https://www.ft.com/content/2d21cf1a-b2bc-11e8-99ca-68cf89602132

[23] *How Purdue's 'one-two' punch fuelled the market for opioids*, Financial Times (Sept. 10, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

127. That way the Sacklers could continue to profit off opioids while appearing to back away from Purdue. Despite being registered as a separate company from Purdue, staff from Rhodes and Purdue used the same employee handbook and "little distinction [was] made internally between the two companies." McKinsey worked in league with both for the Sacklers.

128. By 2016, Rhodes held a larger share of the opioid market than Purdue. Through Purdue, the Sacklers controlled 1.7% of the overall opioid market. When combined with Rhodes, however, the Sackler's share of the overall opioid market was approximately 6% of all opioids sold in the United States.[24]

129. The Sacklers' involvement in Rhodes and its relationship to Purdue was not publicly known until the September 9, 2018, publication of an article in the *Financial Times.* Several of the Sackler-owned Rhodes entities are among the Debtors in the pending Purdue proceedings under Chapter 11 of the Bankruptcy Code.

130. Apart from boosting Rhodes' sales, McKinsey's plan for defeating the Corporate Integrity Agreement's incentive restrictions benefitted the Sacklers' goal of positioning Purdue as an attractive acquisition target in a broader way; growing the overall market was just as important as market share: "Whereas pharma salespeople are usually compensated based on their ability to grow sales of a particular medicine, part of the bonus for Purdue's staff was calculated in relation to the size of the overall market."[25] Boosting generic opioid pills, and paying incentives to do it, was not only a way to skirt the Corporate Integrity Agreement but also to expand and exploit the overall market for opioids and the profitability it promised.

### E.    Overcoming Resistance to Opioids

---

[24] *Id.*
[25] *Id.*

131. In July 2013, as part of pushing *Turbocharge*, McKinsey informed Purdue and the Sacklers that OxyContin revenues were down because, among other things, "entire pharmacies [are] being shut off by distributors, pharmacies themselves imposing tablet limits, decreases in channel inventory leading to greater stockouts, and pharmacies choosing to not stock OxyContin." McKinsey's plan: create an "alternative model for how patients receive OxyContin. This model would bypass retail, likely through a third party vendor who would provide adjudication and direct distribution to patients."

132. As set out above, *Turbocharge* got the go-ahead, and included the "alternative supply channels" distribution tactic, and by October 2013, Purdue had approached six potential partners, but all six rejected Purdue's offer because they were "not comfortable with mail fulfillment" and were concerned with the "risk associated with dispensing OxyContin" under that model. Purdue updated the Sacklers on status at the Board meeting that month: "What is Purdue Considering? Includes exploring opportunity to distribute directly; exploring existing channels (Specialty pharmacies, independent pharmacy networks)."

133. In May 2015, Purdue brought in a vendor as part of implementing *Turbocharge*. The vendor stated Purdue could expect a "100% fill rate" and was structured so that the pharmacy was paid a fee for dispensing a prescription. Purdue entered agreements with three specialty pharmacies to fill OxyContin prescriptions that other traditional pharmacies had rejected. The implementation agreements with the specialty pharmacies paid above fair market value based opioid volume.

134. Some prescriptions filled by the "specialty" pharmacies had been rejected by traditional retail pharmacies and displayed indicia that the prescriptions were not for a medically accepted indication; for uses that were unsafe, ineffective, and medically unnecessary; and that were often diverted for uses that lacked a legitimate medical purpose.

135. Thus, from mid-2015 through 2018, the specialty pharmacies filled prescriptions for Purdue opioids written by prescribers thought to be engaged in abuse and diversion, and from October

2015 through 2018, Purdue paid the specialty pharmacies kickbacks to fill prescriptions that other traditional pharmacies had rejected.

136. Also, as part of the implementation, Purdue's sales representatives and its medical affairs department employees referred prescribers and patients to the specialty pharmacies when they had difficulty filling prescriptions for any Purdue opioids, including OxyContin.

137. Purdue and the Sacklers got what they wanted with McKinsey. From 2008 to 2016, Purdue distributed over $4 billion to the Sacklers, with $877 million in 2010 alone.

138. These distributions, in line with the Sacklers' and Purdue's goal, would not have been possible without McKinsey's plans and implementation.

139. The Sacklers were aware of the value McKinsey provided: for example, on December 2, 2013, CEO John Stewart informed Kathe Sackler and Vice President of Sales and Marketing Russell Gasdia that *Turbocharge* "was already increasing prescriptions and revenue." These results were coming even before the strategy was deployed as the theme of the 2014 National Sales Meeting.

140. McKinsey's impact on Purdue's growth: while net sales of OxyContin totaled approximately $1 billion in the year of the Purdue's first guilty plea and restrictive Corporate Integrity Agreement, by 2010, with McKinsey, OxyContin sales exceeded $3 billion, treble the revenue.

141. And, with McKinsey ensconced in Purdue, OxyContin reached an all-time high in 2013, when *Turbocharge* was unveiled - internally. The fact that sales peaked in 2013 meant success, given that U.S. overall opioid prescriptions had peaked three years earlier.[26] McKinsey's Purdue efforts added a final push to OxyContin sales before the eventual unraveling when Purdue ceased marketing the drug in 2018.

---

[26] Gery P. Guy Jr, *at al.*, *Vital Signs: Changes in Opioid Prescribing Patterns in the United States, 2006-2015*, Centers for Disease Control and Prevention,  July 7, 29017, *available at:* https://www.cdc.gov/mmwr/volumes/66/wr/mm6626a4.htm

142. In 2014, according to Purdue, there were 5.4 million OxyContin prescriptions written. And, in line with the marketing plan, 80% were for twelve-hour dosing, and of those more than half were for doses greater than 60 milligrams per day.

143. While installed at Purdue, McKinsey described its medical industry capabilities: "Indeed, there is a doctor in the house. We have more than 1,700 consultants with significant healthcare experience, including more than 150 physicians and 250 consultants with advanced degrees in genetics, immunology, biochemical engineering, neurobiology, and other life sciences. We also have 75 consultants with advanced degrees in public health, healthcare management, and related fields."

## F.    McKinsey: Opioid Experts

144. By the time it settled into its role at Purdue, McKinsey had extensive experience with opioids and kept up on what prescribers knew and did not know, and concerns prescribers might have had, about OxyContin abuse, addiction, and diversion. McKinsey briefed Purdue on "Findings on messaging and positioning," part of a presentation to Purdue entitled "OxyContin growth opportunities."

145. McKinsey had signed-on as the marketing brains for a manufacturer of addictive opioids products while that manufacturer was bound by a 5-year Corporate Integrity Agreement covering wrongful opioid sales and marketing practices that expired in 2012. By then OxyContin accounted for 94% of Purdue's revenue.[27] As late as 2018, it remained 84% of Purdue's revenue.[28]

146. McKinsey knew what it was pushing; its agreement in concert with Purdue was to increase opioid sales when Purdue was obligated to restrict its marketing strategies that had caused the overprescribing of addictive opioids and the inevitable consequences. McKinsey's job was to counter

---

[27] Gerald Posner, *Pharma,* pg. 524 (Simon & Schuster 2020).
[28] *Id.*

the intended results of the Corporate Integrity Agreement and to devise strategies to sell as many Purdue opioid pills as possible. Through McKinsey, Purdue sales grew exponentially, unabated by the Corporate Integrity Agreement.

147. McKinsey cannot feign ignorance of the damage done by OxyContin, the addictive drug it was paid to promote. Such a plea would collapse given McKinsey's "granular" understanding of Purdue's and the Sacklers' business. In June 2009, McKinsey identified, devised, and implemented[29] the means for "countering the emotional messages from mothers with teenagers that overdosed on OxyContin."

148. McKinsey's aggressive approach to marketing Purdue opioids to prescribers exacerbated the opioid crisis. A recent Journal of American Medical Association study analyzed the Centers for Medicare and Medicaid Services' Open Payments database regarding pharmaceutical company marketing efforts towards doctors, as well as CDC data on prescription opioid overdose deaths and prescribing rates, to assess whether pharmaceutical marketing of opioids to physicians affected the rate of prescription opioid overdose deaths.

149. The JAMA study analyzed these marketing practices from August 1, 2013 through December 31, 2015.[30] These dates are significant, as the study captures the same timeframe that McKinsey implemented *Turbocharge* at Purdue.

---

[29] In a 2013 presentation to Purdue's CEO and VP of Sales and Marketing, McKinsey referenced McKinsey's "prior experiences serving Purdue that go back 10 years." Presentation by McKinsey to John Stewart and Russell Gasdia entitled *Identifying granular growth opportunities for OxyContin: First Board Update*, dated July 18, 2013, Pg. 2.
  While McKinsey's relationship with Purdue dates back to approximately 2003, the earliest known details of its work for Purdue date to June 2009. What McKinsey did for Purdue before 2009 will be the subject of discovery.
[30] Scott E. Hadland *et. al.*, *Association of Pharmaceutical Industry Marketing of Opioid Products with Mortality from Opioid-Related* Overdoses, JAMA Network, January 18, 2019, *available at:* https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2720914

150. The study noted "physician prescribers are the most frequent source of prescription opioids for individuals who use opioids non-medically"[31] and found "increased county-level opioid marketing was associated with elevated overdose mortality 1 year later, an association mediated by opioid prescribing rates; per capita, the number of marketing interactions with physicians demonstrated a stronger association with mortality than the dollar value of marketing."[32]

151. Marvin Bower, a McKinsey founder and managing director from 1950 to 1967, instilled an ethos at McKinsey: "Deliver bad news if you must, but deliver it properly."[33]

152. There was bad news. There was no proper way McKinsey could help a business knowingly maximize the excessive sales of its addictive opioids, and all-the-more-so, one that had pled guilty to federal crimes in marketing its opioids. But nonetheless McKinsey disregarded the bad news and partnered with Purdue and the Sacklers to push millions more opioid pills on a nation deep into an epidemic.

153. On October 23, 2017, the nationwide opioid epidemic was declared a national "public health emergency." But McKinsey continued to propose solutions to the Sacklers and Purdue to further boost opioid sales. Less than two months later, McKinsey proposed high impact ways to avoid losing Purdue's access to the retail market for opioids. Among them was paying money – "rebates" –when someone overdosed on Purdue's opioids. In McKinsey parlance,[34] rebates for future OxyContin overdoses would be called "Event-Based contracts."

---

[31] *Id.*

[32] *Id*.

[33] McDonald, *The Firm*, pg. 35.

[34] "Consultant-ese," when applied to work as grim as maximizing opioid sales in the face of a national disaster, led one former McKinsey consultant to state: "This is the banality of evil, M.B.A. edition." Walt Bogdanich and Michael Forsythe, *McKinsey Proposed Paying Pharmacy Companies Rebates for OxyContin Overdoses*, New York Times, November 27, 2020, *available at*: https://www.nytimes.com/2020/11/27/business/McKinsey-purdue-oxycontin-opioids.html



MCK-MAAG-0201388

154. A "meaningful" rebate, according to McKinsey, might be between $6,000 and $15,000 per occurrence of overdose (OD) or opioid use disorder (OUD), but the goal was to balance what McKinsey called the "meaningfulness" of the amount paid in rebate against the level of "financial protection" it provided, presumedly to the retailer.



MCK-MAAG-0201388

155. There is clear proof of McKinsey's own legal liability concerns over its role in marketing addictive opioids. The question raised in McKinsey management emails was not *whether* to destroy evidence, but what to do in addition to destroying evidence:

Message

From:       Martin Elling [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
            (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6B33C3264F744B04AF05FA59341271BE-MARTIN ELLI]
Sent:       7/4/2018 12:10:13 PM
To:         A G [drarnabghatak@gmail.com]
Subject:    Re: [EXT]Re: Howdy


Have a great fourth.  M

> On Jul 4, 2018, at 2:01 PM, A G <drarnabghatak@gmail.com> wrote:
>
> Thanks for the heads up.  Will do.
>
>> On Jul 4, 2018, at 7:57 AM, Martin Elling <martin_elling@mckinsey.com> wrote:
>>
>> Just saw in the FT that Judy Lewent is being sued by states attorneys general for her role on the
>> Purdue Board.  It probably makes sense to have a quick conversation with the risk committee to see if we
>> should be doing anything other than eliminating all our documents and emails.  Suspect not but as things
>> get tougher there someone might turn to us.  M
>>
>> +=============================================================+
>> This email is confidential and may be privileged. If you have received it
>> in error, please notify us immediately and then delete it.  Please do not
>> copy it, disclose its contents or use it for any purpose.
>> +=============================================================+

156.  Elling's prediction that things would "get tougher" for Purdue would prove out.

**G.    The Second Guilty Plea**

157. On October 20, 2020, Purdue – McKinsey's co-conspirator – again agreed with the United

States Department of Justice to plead guilty to wrongful marketing of OxyContin and other opioids.

This time the plea agreement concerned its opioid marketing and sales conduct from 2010 to 2018,

when McKinsey was conspiring with and aiding and abetting Purdue, Rhodes and the Sacklers in

reaching their money goals.

158. Purdue agreed to plead guilty to a dual-object conspiracy to defraud the United States and

to violate the Food, Drug, and Cosmetic Act, 21 U.S.C. § 331, 353, among other charges, relating to

its opioid sales and marketing practices after the 2007 guilty plea.

159. The new plea agreement does not name Purdue's co-conspirators; McKinsey is referred

to as "the consulting company."

160. Purdue's new guilty plea concerns Covered Conduct (as defined in the plea agreement) and addresses the time frame of this Complaint.

161. Indeed, ADDENDUM A TO SETTLEMENT AGREEMENT attached to EXHIBIT B to the Purdue 2020 plea agreement states bluntly the U.S. Department of Justice allegation that: "Purdue, in collaboration with [McKinsey], implemented many of [McKinsey's] recommendations." Plaintiff alleges the same here.

162. Further, ADDENDUM A continues that "E2E" [*Project Turbocharge*] "was overseen by [McKinsey] and some of Purdue's top executives through the creation of the E2E Executive Oversight Team ("EOT") and Project Management Office ("PMO")." Plaintiff has alleged the same here and acknowledges that many of the allegations of fact contained in this Complaint are similar to the allegations recited in ADDENDUM A by the U.S. Department of Justice that accompanied the October 20, 2020, Purdue plea agreement.

163. On December 5, 2020, McKinsey issued a rare public statement on its website regarding its work with a specific company. The company was Purdue, and the statement was issued in response to Purdue's second federal guilty plea and media reports regarding McKinsey's OxyContin work after 2009:

# McKinsey statement on its past work with Purdue Pharma

*December 5, 2020*—As we look back at our client service during the opioid crisis, we recognize that we did not adequately acknowledge the epidemic unfolding in our communities or the terrible impact of opioid misuse and addiction on millions of families across the country. That is why last year we stopped doing any work on opioid-specific business, anywhere in the world.

Our work with Purdue was designed to support the legal prescription and use of opioids for patients with legitimate medical needs, and any suggestion that our work sought to increase overdoses or misuse and worsen a public health crisis is wrong. That said, we recognize that we have a responsibility to take into account the broader context and implications of the work that we do. Our work for Purdue fell short of that standard.

We have been undertaking a full review of the work in question, including into the 2018 email exchange which referenced potential deletion of documents. We continue to cooperate fully with the authorities investigating these matters.

164. There is no need to dissect, in this Complaint, McKinsey's public attempt to obfuscate what it did at Purdue to benefit the Sacklers and to the detriment of the health of the people and public institutions of the United States including Plaintiffs.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)
### (18 U.S.C. §1961, et. seq.)

165.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if they were set out in full here.

166.    Count I is brought by Plaintiffs on behalf of themselves.

167.    At all relevant times, Defendant McKinsey is a "person" within the meaning of 18 U.S.C. §1961(3) because it is capable of holding, and does hold, a "legal or beneficial interest in property."

168.    RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. §1962(c).

169. RICO makes it unlawful for "any person to conspire to violate" the provisions of 18 U.S.C. §1962(c). 18 U.S.C. §1962(d).

170. As alleged herein, at all relevant times, Defendant McKinsey enabled Purdue to aggressively market, promote, distribute and sell its opioids throughout Kentucky and elsewhere across the nation by over-emphasizing what it represented to be the under-treatment of pain and deceptively marketing opioids as being: (a) rarely, if ever, addictive; (b) safe and effective for the treatment of chronic long-term pain and everyday use; (c) abuse resistant or deterrent; and/or (d) safe and effective for other types of pain for which the drugs were not approved. Defendant McKinsey had a detailed,

what it termed a granular, understanding of Purdue and its business model including its products, its marketing and sales strategies and tactics, the work of its sales force, and its management and ownership, and had comprehensive knowledge of Purdue and related companies and the Sacklers' roles in the ownership, control and management of Purdue and related companies. McKinsey joined with Purdue in those actions, including efforts to evade the strictures of the Corporate Integrity Agreement previously described that accompanied Purdue's 2007 plea of guilty to violation of federal law, and including a continuation of similar and expanded behaviors calculated to violate the law, and which later resulted in a second guilty plea set out in detail in the U.S. Department of Justice letter dated October 20, 2020, countersigned in a COMPANY REPRESENTATIVE'S CERTIFICATE by the Chairman of the Board of Directors of Purdue and by Counsel for Purdue in a CERTIFICATE OF COUNSEL. Related to the new guilty plea was "EXHIBIT B, SETTLEMENT AGREEMENT" that, in paragraph 7. g. thereof, specifically excluded "consultants" to Purdue and affiliated entities from being released under its terms. Defendant McKinsey was the consulting company referenced in multiple paragraphs of "ADDENDUM A TO SETTLEMENT AGREEMENT" attached to EXHIBIT B to the Purdue 2020 plea agreement detailing McKinsey's aiding and abetting and conspiring in the wrongdoing of Purdue during the years covered in the guilty plea agreement, 2010 – 2018, all with the purposes of achieving excessive profits enabling Purdue to transfer excessive amounts of money to the owners of Purdue, the Sacklers.

171. In particular, McKinsey was employed by and chose to associate with Purdue, Rhodes and the Sacklers, and conducted and participated in the affairs of Purdue (the "Opioid Enterprise"), whose purpose was to deceive opioid prescribers, and the public and regulators into believing that: (a) opioids were safe and effective for the treatment of long-term chronic pain; (b) opioids presented minimal risk of addiction; and/or (c) Purdue was in compliance with Kentucky and federal reporting obligations. In participating in this enterprise, McKinsey sought to maximize Purdue's and Rhodes'

revenues and profits and the Sacklers' receipts therefrom through the design, manufacture, marketing, promotion, distribution and sale of opioids which, in fact, were highly addictive and often ineffective and dangerous.

172.    As a direct and proximate result of this scheme and common course of conduct, McKinsey was able to extract billions of dollars of profit for Purdue and Rhodes and for distribution to the Sacklers. As explained in detail above and below, McKinsey's years-long misconduct violated 18 U.S.C. §1962(c)-(d).

## A.  The Opioid Enterprise

173. At all relevant times, McKinsey along with Purdue, Rhodes, and the Sacklers associated and schemed in the marketing, promotion, distribution and sale of opioids and operated an "enterprise" within the meaning of 18 U.S.C. §1961(4). This "Opioid Enterprise": (a) existed separately from each of its component entities; (b) existed separately from the pattern of racketeering in which McKinsey engaged; and (c) constituted an ongoing organization consisting of legal entities, including, but not limited to, McKinsey, Purdue, Sackler family members, Rhodes, as well as others.

174. Within the Opioid Enterprise, there was a common communication network by which members exchanged information on a regular basis through the use of wires and mail. The Opioid Enterprise used this common communication network for the purpose of deceptively marketing, selling, and distributing opioids to the general public. When their products, marketing, promotion, distributions, sales, and failure to report suspicious sales were questioned by other parties, including physicians and pharmacies, the Opioid Enterprise members took action to hide the scheme, to prevent its discovery, and continue its existence.

175. The participants in the Opioid Enterprise were systematically linked to each other through corporate ties, contractual relationships, financial ties and the continuing coordination of activities. Through the Opioid Enterprise, McKinsey functioned as a continuing unit with the purpose of

furthering the illegal scheme and the common purposes of increasing Purdue's and Rhodes' sales, revenues, and profits, and market for opioids and minimizing Purdue's losses notwithstanding the five-year long Corporate Integrity Agreement that accompanied Purdue's plea of guilty to federal crimes in 2007, and for many years following the expiration of the Corporate Integrity Agreement. Each member of the Opioid Enterprise reaped the bounty generated by the enterprise by sharing the benefit derived from increased sales of opioids and other revenue generated by the scheme to impose their will on prescribers, pharmacies and consumers and by failing to report suspicious sales and finding alternative paths for achieving sales in the event of resistance in the distribution and sales network.

176. The Opioid Enterprise engaged in deceptive marketing, promotion, distribution and sale of opioids as non-addictive, and as safe and effective for chronic long-term pain and for uses not FDA-approved. Further, the Opioid Enterprise not only failed to report suspicious sales but also identified hurdles to distribution and sales and devised and implemented multiple tactics to overcome those obstacles. The Opioid Enterprise engaged in such activity for the purpose of maximizing the sale of and profits from opioids. To fulfill this purpose, the Opioid Enterprise advocated for, and caused the over-distribution and over-prescription of, opioids by marketing, promoting, advertising, and selling opioids throughout Kentucky and the country, and by failing to report suspicious sales. Their receipt of monies from these activities has consequentially affected Kentucky and interstate commerce. The Opioid Enterprise's past and ongoing practices thus constitute a pattern of racketeering activity under 18 U.S.C. §1961(5).

177. Through this illegal enterprise, McKinsey as a co-conspirator engaged in a pattern of racketeering activity that involved a scheme to increase revenue for Purdue, the Sacklers, Rhodes and the other entities and individuals associated in fact with the Opioid Enterprise's activities through the deceptive marketing, promoting, distributing and selling of opioids and the failure to report suspicious sales.

178. McKinsey participated in operating and managing the Opioid Enterprise by directing its affairs as described in this Complaint. While McKinsey participated in, and is a member of, the Opioid Enterprise, McKinsey has a separate existence from the Opioid Enterprise, including distinct legal status, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

179. McKinsey and other members of the Opioid Enterprise furthered the ends of the Opioid Enterprise through the acts and omissions pled in this Complaint.

180. McKinsey crafted and implemented the relentless marketing, promotion, distribution and sales and McKinsey's success in maximizing Purdue's and Rhodes' sales and profits was due to the tight collaboration among the opioid companies, including among Purdue, Rhodes, and the Sacklers— a formidable partnership that marketed to hundreds of thousands of prescribers across the country. The relationship was strengthened, in part, by individuals, including physicians, that held different leadership and ownership roles at Purdue over the years.

181. Furthermore, McKinsey knowingly engaged with Purdue and had Purdue operate a system to evade efforts of others to prevent or reduce suspicious orders of controlled substances and failed to notify the appropriate DEA field division offices in their areas of suspicious orders, including "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. §1301.74(b).

182. The Opioid Enterprise worked together to further the enterprise by the following manner and means:

    a) jointly planning to deceptively manufacture, market, promote, distribute and sell opioids as non-addictive, safe, and effective for the treatment of chronic long-term pain;

    b) concealing the addictive qualities and risks of opioids from prescribers and the public;

    c) misleading the public about the addictive nature, safety and efficacy of opioids;

    d) otherwise misrepresenting or concealing the highly dangerous nature of opioids from

prescribers and the public;

e)  illegally marketing, promoting, distributing and selling opioids;

f)  collecting revenues and profits from the sale of such products for uses for which they are unapproved, unsafe, or ineffective; and/or

g)  failing to report suspicious sales as required by law, and/or blunting the efforts of others to report or prevent or reduce such sales.

183. To achieve the common goals, McKinsey aided and abetted the hiding from the general public the full extent of the unsafe and ineffective nature of opioids for chronic and other types of pain as described herein, and the suppressing and/or ignoring and evading of warnings about and of resistance from third parties concerning the addictive, unsafe, and often ineffective nature of opioids.

184.    The foregoing allegations support that McKinsey was part of an association of entities that shared a common purpose, had relationships across various members of the Opioid Enterprise, and collaborated to further the goals of the Opioid Enterprise for a continuous period of time. McKinsey knowingly and intentionally engaged in deceptive marketing, promotion, distribution and sales practices and incentivized distributors and physicians to do so as well. McKinsey knowingly and intentionally enabled Purdue and Rhodes to fail to report suspicious orders as required by state and federal law and McKinsey, Purdue, Rhodes and the Sacklers inundated the market with opioids.

## B.  Mail and Wire Fraud

185. To attempt to carry out and to carry out the scheme, McKinsey, a person associated in fact with the Opioid Enterprise, did knowingly conduct and participate, directly and indirectly, in the conduct of the affairs of the Opioid Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5) and 1962(c) and McKinsey employed the use of the mail and wire facilities, in violation of 18 U.S.C. §§1341 (mail fraud) and 1343 (wire fraud).

186. Specifically, McKinsey has committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§1341 and 1343) within the past four years. The multiple acts of racketeering activity which McKinsey committed or aided and abetted in the commission of were related to each other and also posed a threat of continued racketeering activity. They therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by McKinsey's regular use of the facilities, services, distribution channels, and employees of the Opioid Enterprise. McKinsey participated in the scheme by using the mail, telephone and Internet to transmit mailings and wires in interstate or foreign commerce.

187. McKinsey devised and knowingly carried out a material scheme and/or artifice to defraud regulators, prescribers, and the public to obtain money by means of materially false or fraudulent pretenses, representations, promises or omissions of material facts. For the purpose of executing the illegal scheme, McKinsey committed these racketeering cts intentionally and knowingly with the specific intent to advance the illegal scheme.

188.    McKinsey's predicate acts of racketeering, 18 U.S.C. §1961(1), include:

a)  Mail Fraud: McKinsey violated 18 U.S.C. §1341 by sending and receiving, and by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to deceptively market, sell and distribute the opioids by means of false pretenses, misrepresentations, promises and omissions; and

b)  Wire Fraud: McKinsey violated 18 U.S.C. §1343 by transmitting and/or receiving, and by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on misrepresentations and false pretenses, promises and omissions.

189.    McKinsey's use of the mails and wires include, but are not limited to, the transmission, delivery, and shipment of deceptive marketing materials and aiding and abetting the misleading of regulators and the public as to Purdue's compliance with state and federal reporting

obligations. Such materials would not have been delivered, orders for opioids would not have been

filled, and regulators would have not been misled but for McKinsey's illegal scheme, including:

    a)  false or misleading communications to the public and to regulators;

    b)  failing to report suspicious orders as required by state and federal law;

    c)  sales and marketing materials, including slide decks, presentation materials, purported guidelines, advertising, web sites, product packaging, brochures, labeling and other writings which misrepresented, falsely promoted and concealed the true nature of opioids;

    d)  documents intended to facilitate the manufacture and sale of opioids, including reports and correspondence; and

    e)  other documents and things, including electronic communications.

190. McKinsey also used the Internet and other electronic facilities to carry out the scheme and

conceal the ongoing fraudulent activities. For example, Purdue made misrepresentations about opioids

on its websites, YouTube, and through online ads designed by, known to, or approved by McKinsey

and intended to mislead prescribers and the public about the safety, efficacy, and non-addictiveness of

opioids.

191. McKinsey also communicated by U.S. mail, by interstate facsimile, and by interstate

electronic mail with various regional offices, divisions, Purdue, and the Sacklers in furtherance of the

scheme. The mail and wire transmissions described in this Complaint were made in furtherance of

McKinsey's scheme and common course of conduct for Purdue, the Sacklers, Rhodes and others to

deceive prescribers, consumers, and regulators, oversupply the market, and fail to report suspicious

sales.

192. Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire

facilities are concealed from Plaintiffs, and they cannot be alleged without access to McKinsey's or

Purdue's books and records. However, Plaintiffs have described the types of predicate acts of mail

and/or wire fraud that occurred, and Plaintiffs have identified in this Complaint plans by management

personnel of McKinsey to destroy documents and emails. Plaintiffs have also learned that McKinsey

internal documents are to be made public under recent consent judgments. The secretive nature of the Opioid Enterprise's activities made the unlawful tactics discussed in this Complaint even more deceptive and harmful.

193.    The foregoing allegations support that: (a) McKinsey engaged in a pattern of racketeering activity by repeatedly engaging in wire and mail fraud to deceptively market Purdue's opioid products through the use of both print and electronic outlets; and (b) McKinsey designed and enabled Purdue to engage in a pattern of racketeering activity by repeatedly engaging in wire and mail fraud to deceive regulators and oversupply the market while failing to report suspicious sales.

### C.  Conspiracy

194. McKinsey undertook the practices described herein not merely in parallel, with Purdue, but, rather, as part of a common scheme and conspiracy. In violation of 18 U.S.C. §1962(d), McKinsey conspired to violate 18 U.S.C. §1962(c), as described in this Complaint.

195. McKinsey conspired with Purdue, Rhodes and the Sacklers to incentivize and encourage various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, to carry out offenses and other acts in furtherance of the conspiracy. McKinsey conspired to increase or maintain revenues, increase market share, and/or minimize losses for Purdue and their other collaborators throughout the illegal scheme and common course of conduct. To achieve this goal, McKinsey engaged in the aforementioned predicate acts on numerous occasions. McKinsey, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of deceptively marketing, promoting, distributing, and selling opioids through mail and wires.

196. Indeed, for the conspiracy to succeed, McKinsey, Rhodes and Purdue agreed to deceptively market, sell, and/or distribute opioids while failing to report suspicious sales. McKinsey's marketing tactics and Purdue's orchestrated failure to report suspicious sales gave credence to their

misleading statements and omissions to prescribers, consumers, and regulators, and directly caused opioids to inundate the market nationwide.

197. McKinsey knew and intended that government regulators, prescribers, consumers, and governmental entities would rely on the collective material misrepresentations and omissions crafted by it and the other Opioid Enterprise members about opioids and suspicious sales. McKinsey knew and recklessly disregarded the cost that would be suffered by the public.

198. McKinsey also knew that by Purdue filling, and failing to report, suspicious sales, it would significantly increase Purdue's sales and profits.

199. The foregoing illustrates McKinsey's liability under 18 U.S.C. §1962(d), by engaging in their pattern of racketeering and conspiring to achieve their common goal of excessive and unlawful opioid sales.

200. As described herein, McKinsey engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from consumers, based on McKinsey's misrepresentations and omissions. The predicate acts also had the same or similar results, participants, victims and methods of commission. The predicate acts were related and not isolated events. The predicate acts all had the purpose of generating significant revenue and profits for Purdue and Rhodes, and through them, the Sacklers. The predicate acts were committed or caused to be committed by McKinsey, Purdue, Rhodes, the Sacklers and others through their participation in the Opioid Enterprise and in furtherance of the scheme.

201. Plaintiffs were directly and proximately injured by McKinsey's racketeering activity. But for McKinsey's misconduct, misleading and false marketing, misstatements and omissions—and the scheme employed by the Opioid Enterprise—Plaintiffs would not have been forced to bear the costs of the current opioid epidemic as alleged in this Complaint.

202.    McKinsey's violations of 18 U.S.C. §1962(c)-(d) have directly and proximately caused injuries and damages to Plaintiffs as alleged in this Complaint, and Plaintiffs bring this action in accordance with 18 U.S.C. §1964(c) for three times their actual damages, as well as injunctive/equitable relief, costs and reasonable attorneys' fees, and pre- and post-judgment interest.

## SECOND CLAIM FOR RELIEF
### PUBLIC NUISANCE

203.  Plaintiffs re-allege and incorporate by reference each and every allegation contained in all preceding and subsequent paragraphs by reference.

204.  Count II is brought by Plaintiffs on behalf of themselves.

205. McKinsey's unlawful actions have created a public nuisance under the laws of Kentucky.

206. McKinsey conspired with and aided and abetted Purdue, Rhodes and the Sacklers in the marketing, promoting, distributing and selling of opioids as aforesaid and thereby caused the widespread distribution of prescription opioids throughout the United States and, specifically, throughout Kentucky resulting in opioid addiction and abuse.

207. McKinsey's conduct enabled the alleged conduct in unlawfully marketing, promoting, distributing, and selling excessive amounts of prescription opioids, and causing such opioids to be distributed and sold for improper purposes, when McKinsey knew, or reasonably should have known, that opioids would be used, possessed, and/or diverted unlawfully nationwide, including in and around Plaintiffs' counties and cities in Kentucky.

208. McKinsey knew that Purdue had pled guilty to federal crimes and entered into a Corporate Integrity Agreement that was intended to avoid and to reduce the potential for the kind of public nuisance visited upon communities in Kentucky and across the United States, and to prevent its imposition upon public entities such as Plaintiffs. Despite this, McKinsey engaged in conspiring with and aiding and abetting the marketing, promoting, distributing, and selling of prescription opioids as alleged in this Complaint. McKinsey knew, or reasonably should have known, that its actions created

a strong likelihood that these illegal distributions of excessive amounts of opioids would cause widespread opioid addiction and over-use among residents of communities and interfere with public health, safety, and welfare of such communities, including those served by the local governments of Plaintiffs.

209. McKinsey knew, or reasonably should have known, that Purdue, Rhodes and the Sacklers would and did distribute opioids, and caused opioids to be distributed, without maintaining effective controls against diversion, including monitoring, reporting, and refusing shipment of suspicious orders, and would cause widespread opioid addiction and over-use among residents of communities and interfere with public health, safety, and welfare, of such communities including those served by Plaintiffs' local governments.

210. As a direct result of McKinsey's conduct, Plaintiffs have suffered damages, including, but not limited to, expenditures to provide additional services and other supports and services because of injuries and damages after their residents' damaging exposure to opioids and direct costs to Plaintiffs for health care, disability benefits and workers' compensation.

211. Thus, McKinsey's conduct contributed to causing a public nuisance with effects that are continuing and, if unabated, will continue to threaten the health, safety, and welfare of the residents, citizens, and taxpayers of the counties and cities of the Plaintiffs, and Plaintiffs have a clearly ascertainable right to abate this nuisance and its effects and seek relief in this Complaint from the effects of said nuisance.

### THIRD CLAIM FOR RELIEF
### NEGLIGENCE
### Violation of Statutory Duties

212. Plaintiffs incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

213. Count III is brought by Plaintiffs on behalf of themselves.

214.  Reasonably prudent prescription opioid manufacturers, and companies working with them, as McKinsey was with Purdue, that had accepted the responsibilities to plan and implement marketing, promoting, distributing and sales programs would not have misrepresented the risks of prescription opioids, nor overstated their benefits and would have implemented basic controls—required under federal law—to prevent opioid diversion in the supply chain.

215.  Instead, McKinsey planned and implemented Purdue and Rhodes programs for the marketing, promotion, distributing and selling of opioids that enabled Purdue and Rhodes to systematically violate statutory duties related to marketing opioids. These duties required Purdue and Rhodes to maintain effective controls against the diversion of their drugs, to design and operate a system to identify suspicious orders of their drugs, to halt unlawful sales of suspicious orders, and to notify the DEA of suspicious orders. McKinsey thus enabled Purdue's and Rhodes' failure to meet the standard of care established by statute by promoting the flow of excessive quantities of prescription opioids into the communities in which Plaintiffs provide government services to the residents of Kentucky and employ residents of Kentucky. See, e.g., the Controlled Substances Act, 21 U.S.C. § 801 et seq; 21 C.F.R. § 1301.74(b).

216.  Every registrant—including Purdue and Rhodes—is charged with being vigilant in deciding whether a customer, be it a pharmacy, wholesaler, or end customer, can be trusted to deliver or use controlled prescription narcotics only for lawful purposes. Specifically, drug manufacturers and distributors are required to maintain "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels."

217.  McKinsey, in the ways alleged above, enabled Purdue and Rhodes to breach its duties to exercise due care in the business of manufacturing, marketing, and wholesale distribution of prescription opioids, including by filling unreasonably suspect orders over and over again, without imposing proper controls to monitor, identify, investigate, limit, and report suspicious orders for

opioids. The very purpose of these duties was to prevent the harms that have directly followed: diversion of highly addictive drugs for illegal and/or non-approved purposes. Thus, the McKinsey-designed-and-implemented marketing, promotion, distribution, and sales strategies enabled Purdue and Rhodes to accomplish those violations and caused the ensuing harm

218.    Accordingly, McKinsey enabled Purdue and Rhodes to breach its statutory and regulatory established duties of care that were designed specifically to prevent the harms from the overuse, abuse and misuse of controlled substances, including opioids, by engaging in negligence, failing to use reasonable care, to the significant harm of Plaintiffs as aforesaid, and, McKinsey was reckless and acted with conscious indifference to the consequences of its actions and inactions as alleged herein.

219.    Plaintiffs seek all legal and equitable relief as allowed by law, including, inter alia: compensatory and punitive damages, costs, and pre- and post-judgment interest.

## FOURTH CLAIM FOR RELIEF
### NEGLIGENCE

220.    Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

221.    Count IV is brought by Plaintiffs on behalf of themselves.

222. McKinsey had a duty to exercise reasonable care with regard to the marketing, promotion, distribution and sale of opioids manufactured by Purdue and Rhodes that were marketed, promoted, distributed and sold pursuant to McKinsey's plans and the implementation of those plans as part of its ongoing relationship with Purdue as alleged above.

223. McKinsey breached that duty to exercise reasonable care by the conduct alleged in this Complaint.

224. McKinsey's conduct in breach of its duty caused loss and damage to Plaintiffs alleged in this Complaint.

225. McKinsey's conduct as alleged was reckless and consciously indifferent to the consequences of its actions and inactions and caused loss and damage to Plaintiffs as alleged above.

226.    Plaintiffs seek all legal and equitable relief as allowed by law, including, inter alia: compensatory and punitive damages, costs, and pre- and post-judgment interest.

### FIFTH CLAIM FOR RELIEF
### NEGLIGENCE: Failure to Warn

227.    Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

228.    Count V is brought by Plaintiffs on behalf of themselves against McKinsey.

229.    McKinsey had a duty to exercise reasonable care in the marketing, promotion, distribution and sale of opioids manufactured by Purdue and Rhodes that were marketed, promoted, distributed and sold pursuant to McKinsey's plans and the implementation of those plans as part of its ongoing relationship with Purdue as alleged above, and that duty to exercise reasonable care included the duty to warn adequately of the potential dangers associated with the use of Purdue's and Rhodes' opioids as alleged above.

230.    McKinsey knew, or in the exercise of reasonable care should have known, that opioids were highly addictive and inappropriate and unsafe for the treatment of chronic pain, and McKinsey knew, or in the exercise of reasonable care, should have known, the dangers associated with the use of Purdue's and Rhodes' opioids as alleged above.

231.    McKinsey further knew, or in the exercise of reasonable care should have known , that widespread opioid addiction and abuse were harmful to men and women, including pregnant women, consuming opioids, their children, their friends, families, and communities, and those, like Plaintiffs, responsible for paying for government services, as specified above, for those exposed to opioids, as well as for health care costs associated with opioid addiction and abuse among their insureds.

232.    Nonetheless, McKinsey unreasonably persisted in spreading misinformation and burying the truth about the safety and efficacy of opioids, and McKinsey breached its duty and failed to take reasonable precautions to warn of the dangers of opioids in presenting opioids to the public in conjunction with Purdue and Rhodes, and further, McKinsey was reckless and consciously indifferent to the consequences of its actions and inactions.

233.    By failing to adequately warn the public, including prescribing doctors and Plaintiffs, of the dangers of opioids, McKinsey's conduct directly injured Plaintiffs. Because of McKinsey's misinformation campaign, and failure to warn, Plaintiffs became obligated and has paid for further and additional governmental services for residents exposed to opioids, will do so in the future, and paid for or otherwise reimbursed the cost of unnecessary and/or inappropriate opioid prescriptions, as well as the health care costs associated, disability benefits and workers' compensation.

234.    As a consequence of McKinsey's breach of its duty to warn, which was a continuing duty, Plaintiffs have suffered damages and will continue to suffer damages as alleged above.

235.    Plaintiffs seek all legal and equitable relief as allowed by law, including, inter alia: compensatory and punitive damages, costs, and pre- and post-judgment interest.

## SIXTH CLAIM FOR RELIEF
### CONSPIRACY

236.    Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

237.    Count VI is brought by Plaintiffs on behalf of themselves.

238.    As described above, McKinsey intentionally contributed to the prescription drug abuse epidemic in Plaintiffs' Counties and Plaintiffs' Cities, throughout the entire State of Kentucky through repeated intentional actions that violated the Kentucky Revised Statutes Chapter 218A

("KRS 218A") and through reckless disregard for the safety and well-being of the citizens of Plaintiffs' Counties and Plaintiffs' Cities, including:

a) McKinsey conspired with Purdue and Rhodes to intentionally and improperly distribute prescription drugs contrary to KRS 218A;

b) McKinsey conspired with Purdue and Rhodes to intentionally engage in prohibited acts, contrary to KRS 218A;

c) McKinsey conspired with Purdue and Rhodes in deceiving and attempting to deceive medical practitioners in order to promote prescriptions in violation of KRS 218A;

d) McKinsey conspired with Purdue and Rhodes to violate the requirements of KRS 218A;

e) McKinsey conspired with Purdue and Rhodes to intentionally violate KRS 218A;

f) McKinsey conspired with Purdue and Rhodes to intentionally violate industry standards;

g) McKinsey conspired with Purdue and Rhodes to intentionally violate Kentucky law and regulations; and

h) McKinsey conspired with Purdue and Rhodes and intentionally turned a blind eye toward industry standards by regularly enabling Purdue and Rhodes to distribute excessive quantities of commonly-abused, highly addictive controlled substances to entities serving a population of individuals who were abusing prescription medications, many addicted or could reasonably be expected to become addicted, or to engage in illicit drug transactions.

239. The intentional acts and omissions by McKinsey led to the dispensing of controlled substances for illegitimate purposes and fueled a prescription drug abuse epidemic in Kentucky.

240. McKinsey conspired with Purdue and Rhodes to maximize Purdue's and Rhodes' profits and the unwarranted expansion of market and overall opioid sales.

241. McKinsey's unconscionable, unfair, and deceptive acts and practices offend Kentucky's public policy, are immoral, unethical, oppressive, and unscrupulous, as well as malicious, wanton, and manifesting of ill will, and they caused substantial injury to Plaintiffs. In doing so, McKinsey's intentional acts and omissions in conspiracy with Purdue and Rhodes ultimately supplied millions of doses of frequently abused, highly addictive, controlled substances to Kentucky patients, and in all of

this McKinsey was reckless and consciously indifferent to the consequences of its actions and inactions.

242. As a result, Plaintiffs became obligated and have paid for governmental services for residents exposed to opioids, will do so in the future, and paid for or otherwise reimbursed the cost of unnecessary and/or inappropriate opioid prescriptions, as well as the health care costs associated, disability benefits and workers' compensation.

243.   Plaintiffs seek all legal and equitable relief as allowed by law, including, inter alia: compensatory and punitive damages, costs, and pre- and post-judgment interest

## SEVENTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT

244.   Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

245.   Count VII is brought by Plaintiffs on behalf of themselves.

246. As alleged herein (a) a benefit has been conferred upon the McKinsey; (b) McKinsey is aware of the benefit; and (c) McKinsey has accepted and retained the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.

247. McKinsey was compensated for its work increasing opioid sales for Purdue and Rhodes.

248. This compensation for increasing the sales of Purdue's and Rhodes products constitutes money in the possession of McKinsey that, in equity and good conscience, McKinsey ought not be allowed to retain.

249.   Plaintiffs seek all legal and equitable relief as allowed by law from McKinsey, including disgorgement of the monies it received from Purdue and Rhodes for McKinsey's actions described herein.

## DAMAGES

250.    McKinsey's conduct as described herein resulted in direct and foreseeable, past and continuing, damages, which Plaintiffs have incurred, continue to incur, and are certain to incur in the future, for all of which Plaintiffs seek relief as to all claims and counts, as alleged herein. Plaintiffs also seeks the means to abate the effects of the opioid epidemic, including but not limited to, economic damages from McKinsey as reimbursement for the costs associated with past, present, and future efforts to address, pay for, and/or eliminate the harms to Plaintiffs.

251. Plaintiffs do not seek damages for the wrongful death, physical personal injury to any individual, emotional distress, or any physical damage to property caused by McKinsey's actions.

252.    As stated above, Plaintiffs seek all legal and equitable relief, as allowed by law for the respective counts alleged against McKinsey, including, inter alia: restitution; disgorgement of profits; compensatory, treble, and punitive damages; attorney's fees and costs; and pre- and post-judgment interest

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Ronald E. Johnson, Jr.*
Ronald E. Johnson, Jr.
Sarah N. Emery
**HENDY, JOHNSON, VAUGHN, EMERY**
909 Wright's Summit Parkway, Suite 210
Ft. Wright, KY 41011
Telephone: (859) 578-4444
Facsimile: (859) 578-4440
rjohnson@justicestartshere.com
semery@justicestartshere.com

Christopher L. Rhoads
**RHOADS & RHOADS**
115 East Second Street, Suite 100
PO Box 2023
Owensboro, KY 42302
Telephone: (888) 709-9329
Facsimile: (270) 683-1653
chris@rhoadsandrhoads.com